# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOSEPH HENRY MANCILL,

Defendant-Appellant.

UNPUBLISHED
May 26, 2016

No. 325641
Wayne Circuit Court
LC No. 12-006036-FC

Before: OWENS, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals by right his bench trial conviction of second-degree murder, MCL 750.317. Defendant was acquitted of first-degree premeditated murder. MCL 750.316(1)(a). The trial court sentenced defendant to 30 to 50 years' imprisonment. For the reasons set forth in this opinion, we affirm.

## I. FACTS

Defendant's conviction arises out of the stabbing death of Dawn Williams on the evening of May 1, 2012 or early morning hours of May 2, 2012. Timmy Mancill, defendant's brother, testified that he went to defendant's house on the evening of May 1, 2012, and defendant and Williams were at the home. Timmy testified that Williams told him that defendant had "been through fights out there because he was jealous of her and some other men or whatever she had going on, some other friends." Defendant and Williams bragged about "beating somebody else down" earlier and Williams "wanted to go back out there and party" or fight, but defendant did not want her to.

Timmy testified that he was sitting at a table. His cell phone was on the table and he had his wallet out to check how much money he had. Defendant began "snatching things from me" and they started arguing. Defendant said, "I'm a have to use something more than just what I got on me" and went into the kitchen. When he returned, he opened his robe, pulled two knives from his underwear, and started swinging or jabbing them at Timmy, scratching the back of his right shoulder. Timmy ran out of the house. While standing on the porch, Timmy saw defendant hit Williams in the face, drawing blood. Defendant "slammed the door" in Timmy's face and Timmy went home.

-1-

Defendant called Timmy around 6:30 a.m. on May 2, 2012, and asked Timmy to come over because someone had broken into his house and beat him up. Timmy went to defendant's house. When he arrived, the front entry door was standing open, but the outer steel security door was closed. Defendant came to the door and was crying. He had blood on his face and hands, and was using a wash cloth to wipe blood from his chest. Defendant let Timmy in. Timmy asked defendant what happened. Defendant did not really answer, but said that if he were to call the police or to turn himself in, "it would make him have two bodies found dead at that house" and he would go back to prison. He wanted to clean up and hide or dispose of the body. Timmy asked defendant about Williams, and defendant said, "Oh, she ran, she gone."

Timmy saw "a thick trail" of blood leading from the living room to the bedroom and bathroom. While Timmy was following the blood trail, defendant went to the bathroom and then told Timmy, "[C]ome on back here. This is where I found her laying." Standing in the bathroom doorway, Timmy saw a woman's body lying on its back between the tub and the toilet. It was partially wrapped in a sheet. Either the face was only partially covered or defendant pulled the sheet back from the face and Timmy saw enough to identify the body as that of Williams. According to Timmy, defendant told him that if the police questioned him about Williams's death, "he would say she stabbed herself." After seeing the body, Timmy ran out of the house. Once he was a few blocks away, he called 911 to report "a body at Cliff Street." Then he went home.

Louis Mueller, a Detroit police officer, testified that he and his partner were dispatched to defendant's house for "a possible homicide" concerning a "lady in the bathroom lying down with blood." Defendant came to the door wearing nothing but boxer shorts. He had a rag in one hand and a spray bottle in the other. Upon entering, Mueller found a body in the bathroom. It was covered by a sheet from the neck to the ankles and there was a pool of blood around the head. Defendant identified the victim as his friend "Dawn."

Mueller testified that he found a blood trail between the bathroom and the adjoining bedroom. Looking inside the bedroom, Mueller saw blood on the floor and a bed with no sheets on it. He did not see any blood in the living room or dining room. In the kitchen, Mueller found a broken steak knife on the counter. Most of the blade was missing and there was blood on the wooden handle. A bloody paper towel was also on the counter. In the basement, Mueller found some bloody sheets and some socks next to the washing machine and some pillows covered with detergent in the washing machine.

Officer Marcellus Inman arrived at the scene and testified regarding a statement defendant made to him at the scene. Because defendant was in custody and had not been advised of his rights, the testimony was stricken from the record.

Office Javier Chapa responded to the scene and testified to seeing Williams's body in the bathroom with a lot of blood by the head. Williams had blood on her face and what appeared to be defensive cut marks on her fingers and hands. There was a trail of blood between the bathroom and the bed in the adjoining bedroom. The bed did not have any sheets on it and there were two pools of blood on either side of the mattress. In the kitchen, Chapa saw a bloody filet knife with a broken blade wrapped in a bloody paper towel. Chapa further testified that he saw "cleaning products throughout the house" and smelled the odor of an orange-scented cleanser.

There was some kind of product by the front door and other products and sponges in the bathroom, along with a pail of water. Chapa saw spots within the house "where the blood had been smeared in an attempt to clean it." Chapa also testified to seeing "bloody socks and blankets or something" by the washing machine and "some pillows or some blankets" inside the washing machine. There were also drops of blood in the basement that had dripped from the bathroom through a vent or something.

Carl Schmidt, a forensic pathologist, performed an autopsy on Williams' body on May 3, 2012. An external examination showed multiple cuts. Williams had stab wounds to the right and left chest, which punctured both lungs, causing them to collapse. She had defensive cuts to the front of the left thumb and back of the left index finger. She had multiple bruises on the chest and arms. Schmidt concluded that Williams died from "multiple incised stab wounds" and classified the death as a homicide. A toxicology screen showed that Williams had a blood alcohol level of 0.248.

Schmidt testified that it was unlikely that the chest wounds were self-inflicted. He explained that self-inflicted wounds usually appear at a single site and have a particular pattern not seen here. In addition, the other cuts and bruises were indicative of a struggle in which Williams tried to defend herself.

Monica Barylski, a forensic scientist, tested certain evidence in the case. In October 2012, she did serology testing, examining items for biological material. Numerous items were positive for the possible presence of blood. These included a broken knife blade, a knife handle with a broken blade, a paper towel wrapped around the knife handle and blade, a knife sheath, a pair of jeans, a piece of fabric from a mattress, and a wash cloth. Barylski also swabbed the inside waistband of the jeans and the knife sheath for skin cells. The serology samples were forwarded to Amy Altesleben for DNA testing.

Altesleben, a forensic biologist, testified that she performed DNA testing. The skin sample collected from the knife sheath contained material from two donors. The DNA matched Williams' profile at 12 of the 16 locations and it matched defendant's DNA profile at 15 of the 16 locations. The swab from the waistband of the jeans contained material from three donors. Williams was the major donor and the sample matched her profile at 14 of 16 locations. Defendant was a minor donor and the sample matched his profile at all 16 locations. Neither could be excluded as a donor. The blood sample from the wash cloth contained material from two donors. Williams was the major donor and the sample matched her profile at all 16 locations. Defendant was excluded as the minor donor.

In February 2013, Barylski did a comparison of Timmy's DNA to Altesleben's DNA profiles obtained from the serology samples. Timmy was excluded as a donor to the DNA obtained from all of the samples.

Defendant was arrested on May 2, 2012 and was interrogated at the police department. A waiver form was admitted into evidence showing that defendant was advised of and waived his *Miranda* rights at 10:47 a.m. The form was admitted into evidence. Police then proceeded to interrogate defendant and the interrogation was recorded and played for the court at trial. In the middle of the recording, defendant objected to the admission of a written statement he made

during the interrogation and part of the recording itself. The video showed that defendant was questioned by Officer Brannock after being advised of and waiving his rights. That interview began around 11:00 a.m. Then, at about 1:00 p.m., Officer Adrian Lawrence entered and questioned defendant and took a written statement. Lawrence asked defendant, "you've been advised of your rights, are you clear on all that?" Defendant responded, "yes" and proceeded to answer the questions.

Defendant proceeded to draft a written statement. In the statement, defendant denied that he argued with Williams, but stated that Williams was "suicidal, because she was afraid of me putting her out." Defendant denied seeing what happened to Williams, but stated that he "saw her in the bathroom on the floor." When asked how he got marks on his face, defendant stated that he received the cuts when he and Williams were "attacked." Defendant also stated that his clothes were bloody because he moved Williams' clothes and sheets after she "cut herself." Defendant stated that he did not call police because another individual had died in the same house on a previous occasion. The prosecution entered the written statement into evidence.

After defendant moved to suppress part of the recording and his written statement, the trial court held a *Walker*[1] hearing. At the hearing, Lawrence testified that he was not present when Brannock questioned defendant. However, Brannock told him that he advised defendant of his rights, so Lawrence did not go through them a second time. Instead, he asked defendant if he had been advised of his rights and defendant said "yes." Defendant also said "yes" when asked if he was clear on or understood his rights. Lawrence did not ask defendant if he had any questions about his rights. Lawrence testified that defendant did not ask for an attorney, decline to make a statement, or ask to stop the interview.

Lawrence testified that defendant gave his date of birth as August 10, 1953, making him 58 years old at the time of the interview. Defendant "was kind of slumped over" in his seat and coughed "briefly." Lawrence was not aware that defendant had "asked about medications" when talking to Brannock. Defendant did ask Lawrence about them "at the end."

Lawrence asked defendant about "some bloody clothes at the scene[.]" Lawrence admitted that he had seen bloody sheets and socks in the basement, but did not remember seeing any other clothing. Lawrence denied using the term "bloody clothes" to "coerce Mr. Mancill into admitting something." He used the term because he had been advised by another officer that defendant "was wearing clothes that had blood on them" at the scene.

Apparently in reference to defendant's written statement, Lawrence testified that defendant appeared to read it, although he said "he had trouble reading without his glasses[.]" Lawrence also read the questions and answers back to defendant and defendant initialed them.

Following additional argument, the court denied the motion to suppress; the court explained:

---

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

This Court finds that . . . there's really no grounds to suppress the statement or the portion of the video which reflects the interview that was conducted by Officer Lawrence.

This Court finds that . . . this second conversation that began with Officer Lawrence took place on maybe two hours, two hours or so after [defendant] had been given his *Miranda* rights. It's clear from the video that this Court has viewed that he had acknowledged after a question being raised by Officer Lawrence that he had . . . been advised previously of his rights. It's true that he . . . was not asked whether he had any questions about the rights that he had been previously been given, but that, to this Court, does not at all mean that the statements that he made during the interview with Officer Lawrence should be rendered inadmissible just because of that one particular factor.

[] [T]he Court is required to look at the totality of the circumstances. And [defendant] was a very active participant during the interview with Officer Lawrence, which is the interview that was . . . at question. He read statements, he had questions about the statements, he refuted or asserted his innocence as . . . it relates to his involvement in the death of the victim, Ms. Dawn [sic] here in this matter. And . . . this Court finds that there was nothing that was placed or nothing that was viewed in this interview that would indicate that the statement should be . . . suppressed.

[] I didn't hear any significant differences in the statement that he made to Officer Lawrence as compared to those that he made to Officer Brannock. And I think that's a significant piece of information to be reviewed as well.

This Court has viewed a reasonable number of confessions that have been made in the past, not dealing certainly with Mr. Mancill, but just other confessions. And I compare them in those instances where one, we're dealing with perhaps, coercion, and this Court has found previously that there's been coercion in other cases. I'm not afraid to do it. I think I recognize it when I see it, and I did not see it here in this situation.

Also, the situation of asking for assistance medically. I didn't sense from those statements that were made, Mr. Mancill takes care of himself, took care of himself, in this Court's view, through that interview, and noted that he needed medication, that he was on medication, but I didn't sense that there was any type of a medical emergency that he himself felt that he was in some type of distress and that he needed something immediately.

Trial proceeded and defendant testified that Williams stayed at his house from time to time and had come to stay with him again on May 1, 2012. Defendant testified that he did not kill Williams. He believed that her boyfriend named Roger or Timmy killed her. Defendant told the police that Williams had killed herself, explaining that she had been threatening to hurt herself with a knife because she thought defendant was going to kick her out, something she had done in the past. Defendant said he was "trying to solve the case by speculating." Defendant did

not implicate Timmy because "I knew that they was going to lock me up and I didn't want two brothers locked up at one time." Defendant went on to say that much of what he told the police was true in that the events related had happened, but at the same time was not true in that the events related "didn't happen that night." Defendant implied that he inadvertently misled the police because he was "under a demented mind just to get it over with so I can get my medications and get some sleep."

Defendant also introduced the testimony of his cousin Larry. Larry testified that defendant arrived at his home at about 2:00 a.m. on May 2, 2012, spent the night there, and then left at 8:00 a.m. that morning.

Defendant was convicted and sentenced as set forth above. This appeal ensued.

## II. SPEEDY TRIAL

Defendant first argues that the trial court erred in denying his motion to dismiss due to a violation of his right to a speedy trial.

Whether a defendant was denied his constitutional right to a speedy trial is a mixed question of law and fact. *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009). We review factual findings for clear error and constitutional questions de novo. *People v Gilmore*, 222 Mich App 442, 459; 564 NW2d 158 (1997).

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a speedy trial." *People v Williams*, 475 Mich 245, 261-262; 716 NW2d 208 (2006). This Court applies the framework set forth in *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972), to determine whether a defendant has been denied his or her right to a speedy trial. *Williams*, 475 Mich at 261-262. This inquiry involves balancing the following four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. "Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Id*. at 262. "[A] presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id*. In contrast, where the delay is less than 18 months, "the burden is on the defendant to show actual prejudice." *People v Holtzer*, 255 Mich App 478, 492; 660 NW2d 405 (2003).

In this case, defendant was arrested on May 2, 2012. The trial commenced on June 7, 2013; thus, the delay in this case was approximately 13 months. See *Waclawski*, 286 Mich App at 665 (the time for determining whether a defendant was denied the right to a speedy trial runs from the date of defendant's arrest until the date the trial begins). Because the length of the delay was less than 18 months, prejudice is not presumed and defendant had the burden of showing actual prejudice. *Holtzer*, 255 Mich App at 492. A review of the record indicates that defendant has failed to show prejudice.

Here, a large portion of the delay was necessary to complete DNA testing on multiple pieces of evidence. While the first DNA testing was completed in December 2012, both parties indicated that additional testing was required and the additional testing was not completed until

February 2013. Defendant argues that the prosecution failed to timely submit the evidence for DNA testing. However, while the prosecutor was uncertain when the evidence was submitted for testing nothing in the record supports that the prosecutor acted in bad faith in submitting the evidence and defendant did not raise the speedy trial issue until January 28, 2013.

Moreover, defendant cannot show he was actually prejudiced by the delay. The right to a speedy trial protects "three interests of the defendant: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; (3) limitation of the possibility that the defense will be impaired." *People v White*, 54 Mich App 342, 351; 220 NW2d 789 (1974). "In considering the prejudice to the defendant, the most serious inquiry is whether the delay has impaired the defendant's defense." *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994).

Here, defendant was incarcerated for nearly a year, which caused him anxiety. However, "the prejudice prong . . . may properly weigh against a defendant incarcerated for an even longer period if his defense is not prejudiced." *Williams*, 475 Mich at 264. Defendant contends that his defense was prejudiced by "the loss of his witness's memory." However, the only defense witness apart from defendant himself was his cousin Larry, who never claimed a lack of memory concerning defendant's whereabouts between 2:00 and 8:00 a.m. on the morning of the murder. Thus, the delay did not cause the defense to lose any evidence and the pretrial incarceration did not hinder defendant's ability to prepare a defense. While defendant claims that the pretrial incarceration caused him "anxiety and concern," the anxiety did not diminish his defense and "anxiety, alone, is insufficient to establish a violation of [a] defendant's right to a speedy trial." *Gilmore*, 222 Mich App at 462.

In sum, the delay in this case was approximately 13 months, the delay was due primarily to both parties' need for the DNA test results, and defendant has not shown that his defense was prejudiced by the delay. Accordingly, the trial court did not err in concluding that defendant was not denied the right to a speedy trial. *Waclawski*, 286 Mich App at 664.

## III. STATEMENTS TO POLICE

Defendant argues that his Fifth and Fourteenth Amendment rights were violated when the prosecution introduced (1) the pre-*Miranda* statement he made to Officer Inman at the crime scene, (2) the post-*Miranda* statement that defendant made wherein he repeated what he said to Officer Inman, and (3) the written statement he gave to Officer Lawrence.

We review de novo a trial court's ruling on a motion to suppress evidence. *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). A trial court's factual findings, if any, are reviewed for clear error, while underlying constitutional issues are reviewed de novo. *Id.* To the extent we find that a constitutional error occurred, "[w]e review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt." *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010). "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id* . (quotation marks and citations omitted).

"In *Miranda,* the Supreme Court of the United States determined that the coercive nature of custodial interrogations implicated a defendant's Fifth Amendment right to be free from compelled self-incrimination." *People v Vaughn*, 291 Mich App 183, 188–189; 804 NW2d 764 (2010) aff'd in part, vacated in part on other grounds, 491 Mich 642 (2012), citing *Miranda v Arizona*, 384 US 436, 458; 86 S Ct 1602; 16 L Ed 2d 694 (1966). To safeguard against coercion, the *Miranda* court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 US at 444. "Accordingly, before conducting a custodial interrogation, the interrogating officer must advise the suspect of [his or her constitutional] rights." *Vaughn*, 291 Mich App at 189. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda*, 384 U.S. at 479.

## A. STATEMENT TO OFFICER INMAN

Inman testified that he responded to the scene and was standing next to defendant while other officers searched the house. He asked defendant "what happened" and defendant said "she stabbed herself." That evidence was stricken from the record on Fifth Amendment grounds. Defendant contends that the trial court, as the trier of fact, heard the evidence and therefore he was prejudiced. However, this was a bench trial. The trial court was aware that the evidence was inadmissible and the court did not consider the evidence in making its factual findings. In the absence of proof to the contrary, the court is presumed to follow the law, *People v Farmer*, 30 Mich App 707, 711; 186 NW2d 779 (1971), and to have predicated its verdict only "upon evidence properly offered and not upon . . . inadmissible testimony." *People v Payne*, 37 Mich App 442, 445; 194 NW2d 906 (1971). As is apparent from the findings that the court articulated on the record, the court considered the statements defendant made during the recorded interview and his trial testimony, but not the statement to Inman. Thus, defendant has not shown prejudice and is not entitled to relief on this issue.

## B. RECORDED STATEMENTS TO OFFICERS BRANNOCK AND LAWRENCE

Defendant argues that the improper statement to Officer Inman tainted the statements he made to Officers Brannock and Lawrence two hours later after he waived his *Miranda* rights.

In *Oregon v Elstad*, 470 US 298, 314; 105 S Ct 1285; 84 L Ed 2d 222 (1985), the Court held that where police do not use "deliberately coercive or improper tactics" while questioning a defendant, but fail to advise him of his *Miranda* rights, the "subsequent administration of *Miranda* warnings . . . ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." In other words, "if the prewarning statement was voluntary, then the postwarning confession is admissible unless it was involuntarily made despite the *Miranda* warning." *United States v Carter*, 489 F3d 528, 534 (CA 2, 2007). If, however, the police deliberately refrain from advising a defendant of his rights in order to obtain a confession and, having once obtained the confession, then advise the defendant of his rights and obtain the same confession, the *Miranda* warning is ineffective and the postwarning statement is inadmissible. *Missouri v Seibert*, 542 US 600, 616-618, 620-621; 124 S Ct 2601; 159 L Ed 2d 643 (2004). The *Seibert* Court explained:

-8-

relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. [*Id*. at 615.]

In this case, Inman asked a single isolated question at the scene. Although Inman did not advise defendant of his rights, it does not appear that Inman intentionally failed to apprise defendant of his rights in order to obtain a confession. In addition, defendant has not cited any other relevant factors that would mandate a finding that the statement was involuntary under the totality of the circumstances. See *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (discussed in more detail below).

Shortly after Inman questioned defendant, defendant was brought to the police department and questioned by Brannock and Lawrence. Defendant claims that he was brought to the police department about two hours after Inman questioned him. The record shows that the police were called to the scene at 8:14 a.m., that Brannock advised defendant of his rights at 10:47 a.m., and that Lawrence spoke to defendant 2-1/2 hours after that, at 1:10 p.m. There was obviously no continuity of police personnel and no indication that either Brannock or Lawrence was aware of defendant's statement to Inman. It is clear from the record that defendant again said nothing incriminating. He said he was at home with Williams, who was upset and threatening to harm herself with a knife, and that she apparently stabbed herself. There is no record evidence from which we can glean that Inman's questioning of defendant was done with the intent to circumvent *Miranda*. Also, the statement made to Inman did not implicate defendant, rather he stated that the victim had committed suicide. Thus, "there is no concern here that police gave [defendant] *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat." *Bobby v Dixon*, __ US __: 132 S Ct 26, 31; 181 L Ed 2d 328 (2011).

## C. WRITTEN STATEMENT

Defendant argues that his written statement was inadmissible because Lawrence did not first re-advise him of his rights. While Lawrence did not advise defendant of his rights, the record shows that defendant was advised of and waived his rights approximately 2-1/2 hours earlier when questioned by Brannock. "[T]he *Miranda* rights are not a liturgy which must be read each time a defendant is questioned." *People v Godboldo*, 158 Mich App 603, 605; 405 NW2d 114 (1986). "[T]he failure to reread a defendant's *Miranda* rights prior to each interrogation does not render the subsequent statements inadmissible as evidence against him. Rather, a factual question is raised as to whether the statements were voluntary." *Id*. at 607. We find this aspect of defendant's claim without merit.

## D. VOLUNTARINESS

Defendant lastly argues that his statements to Lawrence were involuntary. A statement is voluntary if the totality of all the surrounding circumstances show that it is the product of an

essentially free and unconstrained choice and not the result of an overborne will. *Cipriano*, 431 Mich at 333-334. Our Supreme Court has explained:

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*. at 334.]

"The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness," *Cipriano*, 431 Mich at 334, and no single factor is determinative. *People v Tierney*, 266 Mich App 687, 708; 703 NW2d 204 (2005). The ultimate test of admissibility is whether the totality of the circumstances indicates that the statement was freely and voluntarily made. *Cipriano*, 431 Mich at 334.

The primary focus of defendant's motion in the trial court was Lawrence's failure to reread his rights. Defendant was 58 years old. He was able to read. Defendant had extensive prior experience with the police. Defendant was interviewed twice on the same day and the two interviews together lasted about three hours. It appears that the second interview with Lawrence began a short time after the first interview with Brannock ended. Defendant was advised of his rights at the beginning of the first interview and acknowledged at the beginning of the second interview that he had been advised of his rights and understood them. The trial court found that the second interview occurred "two hours or so" after defendant was advised of his right and that a two-hour gap did not render the second statement involuntary. See *Godboldo*, 158 Mich App at 605-606.

While defendant relies on his trial testimony regarding his illnesses and the medications used to treat them, review is limited to the information made known to the trial court at the time it ruled on the motion to suppress. *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999). Lawrence testified that defendant was slumped over in his seat, but did not attribute defendant's posture to fatigue, illness, or injury. Lawrence testified that defendant coughed briefly and, toward the end of the interview, said something about the fact that he took medication. The trial court found that the statement was not made in the context of a medical emergency such that defendant "needed something immediately." There is nothing in the record to indicate that defendant was seriously ill, abused or threatened with abuse. The trial court found that defendant's statement was not coerced. The only suggestion of "coercion" was Lawrence's reference to "bloody clothes," which was accurate in that bloody socks were found in the basement. In any event, that reference did not induce defendant to made an incriminating statement; the trial court found that there were no "significant differences in the statement that he made to Officer Lawrence as compared to those that he made to Officer Brannock." Considering the totality of the circumstances, the trial court did not err in finding that defendant's statement

was voluntary.  *Cipriano*, 431 Mich at 333-334.  Accordingly, we assign no error and defendant is not entitled to relief.

Affirmed.


/s/ Donald S. Owens
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens