*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JERION KAHARIA-JAQUIAN JAMES,

        Defendant-Appellant.

UNPUBLISHED
May 18, 2023

No. 358574
Midland Circuit Court
LC No. 20-008426-FH

Before: CAMERON, P.J., and K. F. KELLY and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Jerion James, appeals as of right his jury-trial convictions of first-degree home invasion, MCL 750.110a(2), and assault and battery, MCL 750.81. The trial court sentenced him, as a fourth habitual offender, MCL 769.12, to serve concurrent prison sentences of 150 months to 20 years for the home-invasion conviction, and 93 days for the assault-and-battery conviction. The jury found James not guilty of aggravated assault, MCL 750.81a(1), and resisting or obstructing a police officer, MCL 750.81d(1). On appeal, James argues that his right to a speedy trial was violated, that he was denied a fair trial by the use of jury selection by interactive video technology, that the trial court erroneously instructed the jury and his lawyer's failure to object to the improper instructions constituted ineffective assistance, and that the court erred by considering acquitted conduct when sentencing him. We affirm James's convictions, but we reverse his sentences and remand for resentencing.

## I. BASIC FACTS

According to the testimony, James left his vehicle in the driveway while he and his wife visited an acquaintance. Upon returning to the driveway, James discovered that his vehicle was gone, and he used his smartwatch to track the location of the vehicle to a carport at an apartment complex. Once at the complex, James noted the address of the carport and knocked on the door to speak to the residents, one male and one female, about his vehicle. He repeatedly requested his keys, but the residents expressed confusion about why James's vehicle was in their parking area. The conversation grew more intense, as the male resident attempted to keep the door open only slightly, and James moved to wedge himself in the doorway. As the female resident threatened to

call the police, James pushed through the door and entered into the dwelling where the male resident physically confronted James. James ended up on top of the male resident and struck him repeatedly, and the female resident pulled James's shirt from behind, tight to his neck, in an effort to dislodge James. At trial, James testified that he swung his arm at the female resident in order to avoid being choked, and the residents testified that, after the male resident began to flee the home, James punched the female resident then chased after the male. Outside, James's wife told him that she had located belongings from the vehicle so they could leave.

## II. SPEEDY TRIAL

### A. STANDARD OF REVIEW

This Court reviews de novo the constitutional question whether a defendant was denied the right to a speedy trial. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006).

### B. ANALYSIS

A guarantee of a "speedy and public trial" for a criminal defendant is found in both the United States and Michigan Constitutions, and in Michigan is enforced by "statute and by court rule." *Williams*, 475 Mich at 261; see also US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A). The purpose of the speedy-trial guarantee is to " 'minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.' " *People v Sierb*, 456 Mich 519, 531 n 19; 581 NW2d 219 (1998), quoting *United States v MacDonald*, 456 US 1, 8; 102 S Ct 1497; 71 L Ed 2d 696 (1982). To determine whether a defendant has been denied the right to a speedy trial, a court should balance the four factors set forth in *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972): "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice the defendant." *People v Cain*, 238 Mich App 95, 112; 605 NW2d 28 (1999) (quotation marks and citation omitted).

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. It is presumed that a defendant is prejudiced after a delay of 18 months, upon which "the burden shifts to the prosecution to show that there was no injury," and this involves "an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id*. at 262 (quotation marks and citation omitted). James had a period of incarceration of 17 months and 18 days between arrest and trial. This delay was more than the 180 days that the Legislature has deemed reasonable for a person in custody to be brought to trial, see MCL 780.131, but less than the 18-months that courts presume prejudicial.

Regarding the reasons for the delay, it is undisputed that the COVID-19 pandemic and our Supreme Court's orders in response to it were responsible for the greater part of it. We note,

however, that, on July 9, 2020, the trial court held a *Cobbs*[1] hearing which resulted in an additional two weeks for James to consider whether to accept a plea offer. Finally, flooding at the courthouse also contributed to the delay.

The trial court denied James's motion *in propria persona* for dismissal based on the lack of a speedy trial, noting in its opinion and order that all trials had been halted by the COVID-19 pandemic, "due in no part to any specific party and is rather a natural cause and has not caused any undue prejudice to defendant." The trial court further explained:

> It is possible that may be an issue now arising on that time frame but the Court will note that in the interim between the time that the *Cobbs* has occurred and the current date that there has, in fact, been a substantial amount of difficulty caused by the suspension of a lot of proceedings for the Coronavirus Pandemic, including the ability for the Court to conduct jury trials because of the restrictions and, in fact, that has been, in the Court's opinion, . . . one of the subsection six, other, good cause, justifying a delay in the proceedings in this matter and the Court is endeavoring to proceed with all possible haste to get this matter before a jury and we are in the process of trying to get that worked out.

At a subsequent hearing, on James's unsuccessful motion for release on bond, James pointed out that he had been incarcerated for nearly a year. The trial court stated:

> And, once again, as indicated by both sides, we're dealing with a situation here of the pandemic that really constrains the Court's ability to process cases as it would be my desire to have these done as soon as possible. But, when we are simply not allowed to have a jury trial, it makes it difficult to get these accomplished.

Shortly thereafter, on January 30, 2021, James's second lawyer filed a demand for a speedy trial. At a hearing on February 2, 2021, the trial court determined that James's bond should be reduced, from $750,000 to $250,000, because "at this juncture, there is no date for which the Court thinks that a trial is necessarily gonna be able to be conducted" and James had been incarcerated for a year. The court remarked that it "is also aware of the fact that this . . . case had been ready to be tried in . . . a fairly timely fashion, but for the pandemic and there had been a request . . . by prior counsel for a *Cobbs* which resulted in some delay in the proceedings as well." At a May 4, 2021 status conference, the trial court added that it "has been precluded from having jury trials by order of the Supreme Court because . . . the testing level of positive cases in Midland County are exceeding the level that the Supreme Court has permitted us to conduct jury trials in this matter. Otherwise, the prosecution and the Court were prepared to proceed." The court further stated that James's trial would be second in line once trials resumed. Thereafter, James's trial began on July 19, 2021.

---

[1] See *People v Cobbs*, 443 Mich 276, 283; 505 NW2d 208 (1993) (establishing a procedure whereby the trial court provides a preliminary evaluation with regard to an appropriate sentence to assist the defendant in deciding whether to plead guilty).

Delays and docket congestion are inherent in the court system, and, even if they are "technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *People v Gilmore*, 222 Mich App 442, 460; 564 NW2d 158, 167 (1997) (quotation marks and citation omitted). The trial court properly did not hold the prosecution responsible for the docket congestion and delays resulting from COVID-19 safety protocols. As the trial court consistently noted, the parties were waiting for public safety measures to permit the resumption of trials. The prosecution had no control over such administrative measures, and thus no avenue for bringing James to trial sooner. In addition, the prosecution was not responsible for the shorter delays resulting from James's request for a hearing to consider plea options, or from James's second lawyer taking over the defense. Accordingly, the delay from arrest to trial is not imputed to the prosecution.

Moreover, "[a] delay that is under eighteen months requires a defendant to prove that the defendant suffered prejudice." *Cain*, 238 Mich App at 112. "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). Prejudice to the person includes "oppressive pretrial incarceration" as well as "anxiety and concern of the accused." *Barker*, 407 US at 532. James argues that he suffered prejudice to his person because the longer period of incarceration exposed him to greater risk of COVID-19 infection, caused him anxiety, and disrupted his performance of personal, family, and work tasks. Confinement in a populated and enclosed space likely increased the possibility of James's exposure to COVID-19, and his liberties were constrained while he was incarcerated. However, the trial court determined that James should not be released on a conditional bond because he had been convicted of two misdemeanors—malicious destruction of property and assault and battery—while incarcerated for a violent felony and because the court concluded that James was a flight risk because of his possible lengthy sentence if convicted. Thus, any personal prejudice James experienced was attributable at least in part to his own behavior that compromised his prospects for release on bond.

"In considering the prejudice to the defendant, the most serious inquiry is whether the delay has impaired the defendant's defense." *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994). "[I]n determining prejudice to a defendant, we do not look at how the prosecutor's case was improved during the delay, but to whether the defendant's defense was degraded." *People v Holtzer*, 255 Mich App 478, 494; 660 NW2d 405 (2003). James asserts that, because of COVID-19 measures in jail, his ability to consult with his lawyer and contact witnesses was diminished. Yet, his communication with others was not entirely denied. Further, James does not identify any potentially helpful testimony that was not investigated, and at trial presented only his own testimony in his defense. James has, therefore, not shown how the pretrial delay prevented him from presenting evidence that could have supported his defense, and otherwise hampered his ability to adequately prepare or present his defense.

On this record, we conclude that James was not denied his right to a speedy trial.

III. JURY SELECTION

A. STANDARD OF REVIEW

-4-

The trial court conducted voir dire with most of the prospective jurors present, and questioned, via interactive video technology. James argues that MCR 6.006 prohibited this procedure, and that impaneling a jury selected in such a manner violated his right to an impartial jury. This Court reviews the trial court's conduct and scope of voir dire for an abuse of discretion. *People v Orlewicz*, 293 Mich App 96, 100; 809 NW2d 194 (2011). The constitutional question whether a defendant was denied the right to an impartial jury is reviewed de novo. *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012).

## B. ANALYSIS

Although both parties objected to the court's use of interactive video technology to conduct voir dire of many of the prospective jurors, the court noted that it had discretion to determine how to conduct voir dire, and stated that there was not "any basis to require the personal presence of the jurors for the voir dire jury selection process." The trial court selected 25 potential jurors, who were instructed to display themselves on video if not physically in the courtroom, and the court questioned the jurors, and followed up when more information seemed appropriate. Overall, the jury was asked whether they knew anyone involved in the case, any law enforcement officers, or a victim of a crime, and whether any of them had been convicted of a crime, served as jurors in the county, or had health issues that might interfere with jury service, and they were also asked about impartiality, including whether they had issues with the presumption of innocence. The parties then questioned the potential jurors, some of whom were dismissed with challenges. A jury was ultimately sworn in and instructed to report in person the following day.

At the time of James's July 19, 2021 jury selection, MCR 6.006(A) provided, in part, as follows:

> District and circuit courts may use two-way interactive video technology to conduct the following proceedings between a courtroom and a prison, jail, or other location: initial arraignments on the warrant or complaint, probable cause conferences, arraignments on the information, pretrial conferences, pleas, sentencings for misdemeanor offenses, show cause hearings, waivers and adjournments of extradition, referrals for forensic determination of competency, waivers adjournments of preliminary examinations, and hearings on postjudgment motions to amend restitution.

Although the current version of MCR 6.006 expressly authorizes a trial court to conduct jury selection via interactive video,[2] at the time of jury selection in James's case, no provision in the court rule allowed for the use of video technology for jury selection, and the prosecution does not argue otherwise. As explained by this Court, "[b]y carefully delineating the proceedings amenable to the employment of two-way interactive video technology, the Supreme Court has telegraphed that this means of communication may not be used elsewhere." *People v Heller*, 316 Mich App 314, 318; 891 NW2d 541 (2016) (quotation marks and citation omitted). Accordingly, the trial court was not authorized by court rule at the time relevant to conduct jury selection predominantly

---

[2] MCR 6.006 was amended effective July 26, 2021, and September 9, 2022.

-5-

through use of interactive video technology. Even though the trial court correctly stated that it had discretion regarding how to conduct jury selection, we must conclude that it was an abuse of that discretion to employ procedures at variance with the detailed court rules then in place. See *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017) ("A trial court necessarily abuses its discretion when it makes an error of law.").

However, MCR 6.006 concerns the structure for the use of videoconferencing technology, which is a matter apart from impaneling an impartial jury. MCL 769.26 provides as follows:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

Based on our review of the record, it does not appear probable that the use of interactive video technology to voir dire most of the jury affected the outcome of the trial or otherwise resulted in a miscarriage of justice.

James argues that the procedure produced a jury that was not impartial. He also argues that the procedure was confusing. A defendant has a "right to a fair and impartial jury." *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). An important function of voir dire is to allow the court and the parties to discover bias that would render a potential juror incompetent. *People v Jendrzejewski*, 455 Mich 495, 509-510; 566 NW2d 530 (1997). A conviction may not be reversed unless the totality of circumstances indicates that "the defendant's trial was not fundamentally fair and held before a panel of impartial, indifferent jurors." *People v Cline*, 276 Mich App 634, 638; 741 NW2d 563 (2007) (quotation marks and citations omitted).

At the beginning of voir dire, there was an exchange between the judge and a court official about how to number the jurors on the screen, and the judge later validated the prosecutor's apparent confusion regarding a prospective juror's name because the video displayed that juror's number. Further the judge conceded that it was awkward for the potential jurors to see the back of his head through the camera behind him while he looked at them on a screen, and there were two instances when the judge did not initially see a potential juror raise a hand in response to a question. However, these problems with the execution of an unfamiliar process did not themselves reveal that any potential jurors were confused, or unable to provide accurate responses to questions. Consequently, we conclude that James has not demonstrated how the implementation of a then-novel selection process introduced bias into the jury that was ultimately impaneled.

James argues that viewing potential jurors over video limited his, and his lawyer's, ability to view the nonverbal cues they displayed while responding to questions. One of "the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions." *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008). In *Heller*, 316 Mich App at 318-321, this Court provided a lengthy discussion, in the context of felony sentencing, about how video appearances lack the qualities of the more interpersonal interactions present in actual physical appearances. James's argument in this case,

however, does not include any specific allegations of jury bias, or other actual defects in the composition of the impaneled jury.

Because of a trial court's broad discretion in conducting voir dire, the law "does not lend itself to hard and fast rules regarding what is acceptable and what is unacceptable," short of the failure "to elicit enough information during voir dire to make an intelligent assessment of bias." *People v Tyburski*, 445 Mich 606, 623; 518 NW2d 441 (1994). A trial court ensures an impartial jury by "conduct[ing] a thorough and conscientious voir dire." *Id.* The procedure must "allow the elicitation of enough information so that the court itself can make an independent determination of a juror's ability to be impartial." *Id.* at 620. "To the extent that defendant maintains that the process did not result in an impartial jury, defendant has the burden to show that a particular juror was not impartial or, at the very least, that the juror's impartiality was in reasonable doubt." *People v Haynes*, 338 Mich App 392, 411; 980 NW2d 66 (2021).

In this case, the trial court and the parties extensively questioned the prospective jurors about possible biases, and both parties successfully moved to excuse some jurors. And the trial court concluded its questioning by asking whether there was "[a]nybody that they think they'd be unable to fairly and impartially sit as a juror?" and noted that no hands were raised after dismissal of the one juror indicated such difficulty. Each juror then affirmed that he or she would "justly decide the questions submitted," and "render a true verdict" based "only on the evidence introduced and in accordance with the instructions of the Court." Jurors are presumed to follow their instructions, and are presumed to be impartial. *People v Haynes*, 338 Mich App 392, 416; 980 NW2d 66 (2021). We conclude that James, despite identifying an irregularity in the voir dire procedure, has not rebutted those presumptions.[3]

## IV. JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

James argues that the trial court should have instructed the jury that the prosecutor was required to prove that he intentionally entered the complainants' residence to convict him of first-degree home invasion, and that his trial lawyer was ineffective for failing to request such an instruction. Unpreserved claims are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is warranted only if the plain

---

[3] James argues that he should not be required to show prejudice because the error is structural. "Structural errors are structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards." *People v Davis*, 509 Mich 52, 67; 983 NW2d 325 (2022) (quotation marks and citation omitted). The harm rendered by structural errors "is extensive but intrinsic and difficult to quantify[.]" *Id.* We conclude that the harm alleged in this case is not structural. James complains that the unfairness of the voir dire pervaded the entirety of the proceedings and that the unfairness is impossible to quantify. We disagree. The questioning of the potential jurors in this case—notwithstanding that some were questioned in person and others were questioned using remote videoconferencing technology—was sufficient to ascertain whether the jury that was empaneled was impartial.

error resulted in the conviction of an innocent defendant or if "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. Further, unpreserved claims of ineffective assistance are reviewed on the basis of errors apparent on the record. *Unger*, 278 Mich App at 253.

## B.  ANALYSIS

A defendant has the right to "a properly instructed jury." *People v Mills*, 450 Mich 61, 80; 537 NW2d 909 (1995).  "Jury instructions must include all elements of the charged offenses" and cannot exclude "material issues, defenses, or theories that are supported by the evidence." *People v McKinney*, 258 Mich App 157, 162-163; 670 NW2d 254 (2003).  There is no error where the instructions, viewed in their entirety, "fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v McFall*, 224 Mich App 403, 412-413; 569 NW2d 828 (1997) (quotation marks and citation omitted).

James testified that he confronted the complainants at their front door because he thought that they had taken his vehicle, and had leaned in, without entering, to show them information on his watch when the male resident grabbed him and tried to push him.  James continued that he responded by hitting the man, who then slipped and pulled them both to the floor inside.  In closing, James's lawyer recounted this testimony to support the assertion that James did not "force his way in" and was protecting himself.

The elements of first-degree home invasion are as follows:

(1) the defendant either breaks and enters a dwelling or enters a dwelling without permission; (2) the defendant either intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling actually commits a felony, larceny, or assault; and (3) while the defendant is entering, present in, or exiting the dwelling, either (a) the defendant is armed with a dangerous weapon, or (b) another person is lawfully present in the dwelling. [*People v Bush*, 315 Mich App 237, 244; 890 NW2d 370 (2016), citing MCL 750.110a(2).]

The trial court instructed the jury as follows with regard to the elements of first-degree home invasion:

First, that the defendant entered a dwelling without permission.  It does not matter whether the defendant got his entire body inside.  If the defendant put any part of his body into the dwelling without permission, that is enough to count as an entry.

Second, that when the defendant entered, was present, in, or was leaving the dwelling, he committed the offense of an assault.  The fear of an immediate battery . . . or offensive touching constitutes an assault.

Third, that when the Defendant entered, was present in, or was leaving the dwelling at least one other person was lawfully present in the dwelling.

-8-

These instructions were consistent with MCL 750.110a(2). The "final jury instructions" included in the record cited and mirrored the model jury instruction, M Crim JI 25.2c, for "Home Invasion, First Degree-Entering Without Permission."

During deliberations, the jury sent a note asking whether "you need to have intent when putting a body part in the house to count as element #1 in the home invasion charge." The court responded that the jury "must use the language in the jury instruction, 25.2c(1), which indicates what is needed for entry of a dwelling." The following day, James's lawyer stated that, although he did not object to the court's response, he believed that the court should clarify the elements of assault. The court disagreed.

On appeal, James argues that the court did not answer the jury's question regarding whether the intent to enter the home was an element of the crime, and thus that the instructions provided errantly excluded that intent element. However, in light of the evidence presented in this case, the prosecutor was required to prove that James entered without permission and committed an assault. The assault element in MCL 750.110a(2) does not refer to any particular assault crime, thus "both misdemeanor and felony assaults may properly be charged as crimes underlying first-degree home invasion." *People v Sands*, 261 Mich App 158, 163; 680 NW2d 500 (2004). Both the oral and model instructions provided to the jury correctly identified the elements of the crime in accord with MCL 750.110a(2).

James argues that a requirement that the defendant intended to enter into the home should be read into the elements of home invasion, but he cites no authority for this proposition, and we are aware of none. "The breaking and entering of a dwelling, or the entering of a dwelling without permission, constitutes first-degree home invasion if the perpetrator has the intent to commit any felony therein." *People v McCrady*, 244 Mich App 27, 32; 624 NW2d 761 (2000). The language of the statute criminalizes actually committing, or intending to commit, a crime while in a dwelling without permission, where another person is lawfully located, without concern for whether the perpetrator accidentally entered the home.

That means that the prosecutor was required to prove that James committed an assault while in the home without permission, regardless of whether he intended to enter the home. The court instructed the jury that the prosecutor had to prove that James committed an assault and battery against the male resident, which included that the forceful, violent, or offensive "touching must have been intended by the defendant, that is, not, accidental." Thus, the intent involved in James's conviction of first-degree home invasion was that to assault the male resident while in his residence without permission. James argues that the jury might have found him not guilty of home invasion had the court instructed it that the entrance into the home had to be intentional, and the jury believed James's testimony that he fell into the home while engaging in self-defense. However, the trial court's instructions, including its response to the jury's question, were consistent with the evidence and with MCL 750.110a(2). As a result, the trial court did not plainly err when instructing the jury regarding the elements of first-degree home invasion.

James next argues that his lawyer provided ineffective assistance by failing to request an accidental-entry instruction, including by failing to object when the trial court responded to the jury's question without instructing it that the entry had to be intentional. However, as discussed, accidental entry does not defeat the element of first-degree home invasion of entry without

permission. Accordingly, the accident instruction was not applicable. A defense lawyer's performance was not deficient for declining to request a jury instruction that was inapplicable to his charges. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."). For the same reason, James cannot show that his lawyer's performance was deficient based upon his failure to argue, in response to the jury's question on intent, for an instruction that the prosecutor had to prove that James intended to enter the dwelling. See *id*.

## VI. SENTENCING

### A. STANDARD OF REVIEW

James argues that the trial court erroneously relied upon acquitted conduct when scoring the sentencing guidelines and when determining what sentence to impose. A trial court's factual determinations at sentencing are reviewed for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

### B. ANALYSIS

James points out that the trial court relied upon acquitted conduct when scoring offense variable (OV) 3. OV 3 considers physical injury to a victim, and is scored ten points when the victim incurred a bodily injury requiring medical treatment, whether or not the victim actually obtained such treatment. MCL 777.33(1)(d); MCL 777.33(3). OV 3 is scored at five points for bodily injury not requiring treatment. MCL 777.33(1)(e).

At sentencing, James argued that OV 3 should be assessed at 5 points on the basis of the injury he caused the male resident, rather than 10 points on the basis of his having more severely injured the female resident, because he had been acquitted of the charge predicated on the latter conduct. The prosecutor argued, however, that the female resident remained a victim of the assault that was the predicate for the home invasion. The Court agreed with the prosecutor, explaining:

> The Court, I believe, is entitled to make its own determination as to the factual basis that it's a preponderance of the evidence rather than beyond a reasonable doubt.
>
> And, quite honestly, from the evidence that the Court heard, . . . I was of the opinion that there probably had been an establishment of aggravated assault against that, victim . . . beyond a reasonable doubt. The jury did not find so; however, I'm not precluded from making that determination for purposes of sentencing and that it could be a predicate for purposes of home invasion in the first degree, which is, in fact, what the Court finds and I will keep the scoring . . . as scored.

Later, the trial court continued to comment on James's actions toward the female resident as it discussed the events of the crime:

> As I said, if I had been sitting on that jury, I don't think I would have been able to find the defendant not guilty of aggravated assault, from what he did to the

other victim in this case. The facts and circumstances that the jury heard, they made their determination but, I get the right to make my determination when I sentence somebody.

> And, the way that [defendant] hauled off and blasted her, it is not a self-defense although, she may have been trying to pull him off, she may have been choking him but that's because he was beating on her boyfriend and slugging away as she was trying to do everything she can to possibly stop that. And, that's what I heard from the testimony. And, I find that to be very believable of what happened and how quickly everything happened. And the manner in which the defendant responded, it was his own doing that caused all that stuff to come into play.

The court explained that it was recounting those events because it wanted to explain why the sentence, while well within the guidelines range, was different from its earlier *Cobbs* evaluation.

"[D]ue process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *People v Beck*, 504 Mich 605, 629; 939 NW2d 213 (2019). Because a defendant is presumed innocent of conduct over which a jury has specifically found the defendant not guilty, a sentencing court may not consider such conduct as an aggravating factor at sentencing. *Id.* at 626-627. In this case, the trial court violated *Beck* when it stated that it found that James committed aggravated assault and used that finding as a basis for assessing OV 3 at 10 points. Moreover, the court's consideration of the acquitted conduct was expressed as a significant factor at the time of its sentencing decision. Because the trial court clearly fashioned a sentence based upon acquitted conduct, remand for resentencing is warranted.[4]

James asserts in his question presented that any remand for resentencing should take place before a different judge. He does not offer any analysis in support of that position, however. As a result, we conclude that he had abandoned that argument on appeal. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority.").

Affirmed in part, reversed in part, and remanded for resentencing. We do not retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly

---

[4] The prosecution suggests that, because the sentence was within the guidelines range, any error is harmless. We disagree. The court plainly stated that the reason it was imposing a sentence higher than it had indicated during the *Cobbs* evaluation was because of the acquitted conduct. Thus, there is a reasonable probability that the court would have imposed a lesser, within-the-guidelines sentence had it not considered the acquitted conduct.